No.   90-377

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

MARY W. McELWAIN,

     Plaintiff and Appellant,

-vs-

THE COUNTY OF FLATHEAD,
a political subdivision
of the State of Montana,

     Defendant and Respondent.

**FILED**

MAY 2 - 1991

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Leif B. Erickson, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Marshall Murray, Esq.; Murray & Kaufman, P.C.,
Kalispell, Montana

     For Respondent:

          Thomas J. Murphy, Esq.; Conklin, Nybo & Leveque,
P.C., Great Falls, Montana

Submitted on Briefs:   November 15, 1990

Decided:  May 2, 1991

Filed:

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

Plaintiff and appellant, Mary McElwain, appeals the judgment of the District Court, Eleventh Judicial District, Flathead County, denying her claim for damages for the reduction in value of her property caused by the enactment of septic regulations by Flathead County. The District Court, sitting without a jury, held that the regulations served a legitimate State interest in protecting the health and safety of the public, and that appellant was not entitled to any compensation. We affirm.

The issue on appeal is whether the District Court erred in finding that the regulations imposed on appellant's property did not constitute a taking of property.

Appellant purchased approximately fourteen acres of real property along the Flathead River in 1979 for the purpose of building a home in which to retire. At the time of the purchase, the property was subject to the 1975 county regulations for subsurface sewage treatment systems. These regulations made it unlawful to construct or alter an individual sewage system within Flathead County without first obtaining a valid permit for the specific construction proposed. The regulations further set forth a setback requirement of 100 feet from the Flathead River, as well as other requirements dealing with septic tank capacity, minimum absorption area standards, and quality of material used for construction of the system. Nowhere in the 1975 regulations is there a setback requirement from the 100-year flood plain. The appellant would have been able to build her home substantially as

2

originally contemplated, with a 200-foot setback from the edge of the Flathead River, without violating any of the 1975 regulations.

On August 6, 1984, Flathead County adopted a resolution, known as the Flathead County Flood Plain Regulations, and official flood plain maps which showed appellant's property to lie within the 100-year flood plain. These 1984 regulations required a 100-foot setback between the septic system drain field and the flood plain. On August 23, 1984, appellant applied for a permit to install a below-ground septic system on the property in order to begin construction of the retirement home. Her application was denied on the grounds that all of her property was in or within 100 feet of the 100-year flood plain as designated by the flood plain maps. On July 21, 1986, after appellant had hired a civil engineer to prove that a portion of her property was outside the flood plain, the Flathead County Flood Plain Manager agreed that a portion of the appellant's property did in fact lie outside the flood plain.

Appellant reapplied for a below-ground septic system permit on November 6, 1986. The application was denied on the basis that a 100-foot setback between the septic system drain field and the 100-year flood plain could not be attained on the appellant's property. Appellant's drain field as proposed would have been 80 feet from the flood plain. Her request for a twenty foot variance was denied by the county on May 13, 1988. Flathead County advised appellant that the only proposal that may be permitted would be a mounded septic system.

Testimony at trial revealed that the home initially

contemplated by appellant was a three-bedroom home and that a properly designed drain field for a three-bedroom home could have been configured to fit within appellant's property without violating the 100-foot setback from the flood plain requirement and without the need for a mounded septic system. The plans denied by Flathead County contemplated a drain field for a four-bedroom home.

Appellant appealed the denial of her variance request through the entire administrative process before pursuing this action in District Court. No issue as to the appropriateness of the denial of the variance has been raised.

The sole issue on appeal is whether the District Court erred in finding that the reduction in value of appellant's property is not a taking for which compensation is due.

Before we can directly address this issue, however, a brief discussion of the proper standard to be used in police power actions where "takings" challenges are raised is necessary.

The United States Supreme Court has wrestled with the question of what the proper standard should be in police power actions for quite some time. In Penn Central Transportation Co. v. New York City (1978), 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648, the Court said,

> [T]his Court, quite simply, has been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government.

The Court settled on a standard that states if the regulation is "substantially related to the promotion of the general welfare," it does not constitute a taking. Penn Central, 438 U.S. at 138,

4

98 S.Ct. at 2666, 57 L.Ed.2d at 657. The Court added a second half to this standard, requiring that the owner not be denied "economically viable use" of his or her land. Agins v. Tiburon (1980), 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112. This is the standard currently used by the United States Supreme Court in examining taking challenges. Nollan v. California Coastal Commission (1987), 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677. See also Keystone Bituminous Coal Ass'n v. DeBenedictis (1987), 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472.

Previous opinions by this Court have applied a standard of reasonableness to the question of whether a taking has occurred when a land-use regulation is imposed through an exercise of police power. Yellowstone Valley Electric v. Ostermiller (1980), 187 Mont. 8, 15, 608 P.2d 491, 496; Western Energy Co. v. Genie Land Co. (1987), 227 Mont. 74, 78, 737 P.2d 478, 481. We have stated that a regulation adopted through an exercise of police power must be "reasonably adapted to its purpose and must injure or impair property rights only to the extent reasonably necessary to preserve the public welfare." Yellowstone Valley Electric, 187 Mont. at 15, 608 P.2d at 496.

Although "reasonable" is the language this Court has applied to our analysis of taking issues, it is nonetheless a standard of equivalent merit and significance to the federal standard of "substantial." As the United States Supreme Court points out in Nollan, 483 U.S. at 835, 107 S.Ct. at 3147, 97 L.Ed.2d at 688, the standards to be applied to taking challenges are not the same

5

standards as those applied to due process or equal protection claims. "Reasonableness" as used in the former situation does not necessarily carry the same distinction from "substantial" as it does when used in the latter situations.

We applied our standard of reasonableness to a taking issue in Western Energy Co. and held that the statute in question did not meet the standard. There we said "the means chosen to advance the interest must be reasonable," and yet several paragraphs later stated, "[t]he statute does not bear the requisite 'substantial relation to the public health, safety, morals, or general welfare.'" (Emphasis added; citations omitted.) Western Energy Co., 227 Mont. at 78, 737 P.2d at 481. (See also Anderson Insurance v. City of Belgrade (Mont. 1990), 803 P.2d 648, 47 St.Rep. 2287, where this Court used "reasonable" and "substantial" in like context.) Therefore, to clarify this standard and further conform with the federal standard we expressly state that the question to determine whether a land-use regulation is properly invoked is whether the regulation is substantially related to the legitimate State interest of protecting the health, safety, morals, or general welfare of the public, and utilizes the least restrictive means necessary to achieve this end without denying the owner economically viable use of his or her land.

Appellant contends that the regulation fails to meet either part of this standard. Appellant argues that the regulation fails to satisfy the first part because it does not substantially advance the legitimate State interest in public health in the Flathead

6

River Basin. In support of this argument appellant contends that the county has failed to demonstrate that the 100-foot setback requirement from the flood plain would be any more effective than a lesser distance. Appellant maintains that the county has not presented any evidence or scientific data that would allow the court to determine that a 100-foot setback from a flood plain is necessary to _substantially_ advance the State's interest in keeping sewage out of the river.

There are several shortcomings in this reasoning. The first is appellant's assertion that the District Court applied the incorrect standard. Appellant contends that the issue is not whether the regulation is reasonable, as the District Court found, but whether the regulation substantially advances public health. As we stated above, the terms "reasonable" and "substantial" have been used by this Court and the United States Supreme Court interchangeably in the context of police power actions and taking challenges for many years. The District Court relied on the previous opinions by this Court that contain the language "reasonable," and the standard as read from these opinions is the correct standard.

A second flaw in appellant's position is her belief that the county maintains the burden of proving that the regulation meets the necessary standard.

The District Court found that appellant had failed to overcome the presumption that the regulations as adopted were reasonable. Appellant asserts that the District Court erred in relying on

Whistler v. Burlington Northern Railroad Co. (1987), 228 Mont. 150, 741 P.2d 422, to reach this conclusion. Appellant insists that such a presumption is inapplicable to this case, and it is the county that must demonstrate the regulation is substantially related to a legitimate State interest. It is her contention that Whistler does not apply here because the plaintiffs in Whistler were requesting that an administrative order be declared unlawful, and in this case appellant is not challenging the legality of the regulation, but rather is seeking compensation under the Fifth Amendment.

The presumption of validity spoken of in Whistler refers to the general rule that all legislative enactments are presumed valid and the burden of proving their invalidity is on the plaintiff. Reeves v. Ille Electric Company (1976), 170 Mont. 104, 109, 551 P.2d 647, 650. This principle is equally applicable in cases where the legislation in issue is an exercise of the police power, as in this case. Goldblatt v. Hempstead (1962), 369 U.S. 590, 596, 82 S.Ct. 987, 991, 8 L.Ed.2d 130, 135. Therefore, this presumption is indeed applicable to the land-use regulation before us.

Appellant's argument that appellant is not seeking a declaration that the regulation is invalid, as was the situation in Whistler, appears to be an attempt to distinguish Whistler based solely on the fact that appellant is seeking a different remedy.

If a regulation is not properly invoked under the police power and is found to constitute a taking, the remedies available to the government include abandoning its position and discontinuing the

regulation or compensating the landowner for the taking. First Lutheran Church v. Los Angeles County (1987), 482 U.S. 304, 317, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250, 265. It is when the government insists on retaining a regulation notwithstanding the fact it constitutes a taking that compensation will be required. Appellant is requesting this latter remedy and appears to have no interest in seeking to have the regulation declared invalid. Appellant is nevertheless challenging the regulation on the grounds of an unconstitutional taking, and requesting compensation as a remedy, rather than declaring the regulation invalid, cannot serve to distinguish Whistler. The burden of proof lies with appellant and appellant cannot expect to shift this burden of proof over to the county by merely requesting a different remedy.

A review of the record shows the evidence supports a finding that the regulation is substantially related to the legitimate State interest of protecting public health and safety. Requiring a reasonable distance between sewage drain fields and the 100-year flood plain in order to allow adequate soil cleansing of the sewage prevents the public from the endangerment of sewage contaminants. The testimony supported a conclusion that 100 feet was a reasonable distance. In the event of a 100-year flood this regulation helps make certain the river will still be adequately protected from septic systems that comply with these regulations. It is appellant who has failed to show that some distance less than 100 feet would be just as effective in cleansing the sewage. The facts here as applied to the standard to be met indicate a clear substantial

9

relation to the interest of preventing water contamination.

Appellant's contention that current regulations do not protect the public from sewage contamination in any event, and therefore, the enforcement of the regulation cannot possibly serve to advance the State interest in public health, is unpersuasive. Two wrongs have never made a right and do not do so now. The fact that contaminants may currently be entering the river does not prevent the county from initiating measures to help retard and attempt to eventually stop these problems.

Appellant argues that the regulation in question has failed to satisfy the second part of the standard as well. Specifically, appellant contends that the diminution in value of the property from $75,000 to $25,000, clearly meets the constitutional standard of loss of economically viable use.

Appellant cites Knight v. City of Billings (1982), 197 Mont. 165, 642 P.2d 141, in support of her argument that diminution in value of two-thirds is of sufficient constitutional magnitude to constitute a taking. However, past decisions that have found land-use regulations substantially related to the State interest of public health, safety, and general welfare have rejected the argument that diminution in property value by itself establishes a taking. Penn Central, 438 U.S. at 131, 98 S.Ct. at 2663, 57 L.Ed.2d at 653. Diminutions in value of amounts much greater than the two-thirds found here have been held not to constitute a taking. See Euclid v. Ambler Realty Co. (1926), 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303; Hadacheck v. Sebastian (1915), 239 U.S.

394, 36 S.Ct. 143, 60 L.Ed. 348. The issue of economic viability must be resolved by focusing on the remaining use available to the landowner and the nature of the interference with the overall rights in the property, in addition to any reduction in value. Keystone Coal, 480 U.S. at 497, 107 S.Ct. at 1248, 94 L.Ed.2d at 496. In a careful reading of Knight, it is evident that the conclusion reached in that case was based on consideration of these other factors, not solely on the 20 to 30 percent reduction in property value that had occurred.

In view of these additional factors appellant fails to show she has been deprived of the economically viable use of her property. The evidence indicates appellant is still able to utilize the property for the purposes originally intended, that of building home in which to retire, although not as near the river as appellant would have liked. The evidence also reveals the fact that other options are available to appellant. A mounded septic system could be constructed which would allow the appellant more discretion in a building site. The 100-foot setback rule apparently does not apply if a four-foot vertical separation can be achieved between the bottom of the drain field and the 100-year flood elevation. This vertical separation can be created through a mounded system.

We hold that the public interest involved here outweighs the encroachment upon appellant's property. As was stated in Pennsylvania Coal Co. v. Mahon (1922), 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322, 325:

11

> Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power.

The land use regulation in question has been properly invoked under the police power of the State.

Affirmed.

_____
                    Justice

We concur:

_____

_____

_____
                    Justices

12

Justice John C. Sheehy (retired, but called to participate) dissenting:

This is a "taking" case; that is, the issue on appeal is whether the plaintiff's property has been inversely condemned for a public use, which requires the payment to plaintiff of just compensation under federal and state constitutions.

As the state and local regulations are applied in this case, I find a "taking" of private property by the public has occurred, and so I dissent.

There is no dispute as to the damages done to the plaintiff's property. The findings of the District Court (No. 18) show that "plaintiff has suffered damages to her property of a permanent and irreparable nature by means of the diminution of value of the property, based upon fair market value, in the sum of $50,000.00." These damages, the District Court found, resulted from the adoption and imposition on plaintiff's property of the limitations and servitude of the regulations. The damages represent approximately two-thirds of the fair market value of plaintiff's property without the servitude and limitations.

Such damages must be compensated by the public authority unless, as the majority say, (1) the land-use regulation is substantially related to the governmental interest of protecting the public health, and (2) the regulation utilizes the least restrictive method to achieve that end without denying the owner

13

economically viable use of the land. The regulation, and its application here, do not meet either prong of the standard.

The District Court founded its decision on a finding of fact that the activity prohibited, i.e., a septic system within 100 feet of the 100-foot flood plain, would be injurious to the health and safety of the community. The evidence in this record is completely lacking that the regulation (1) is substantially related to the state's interest in protecting public health, and (2) is the least restrictive method to attain that end.

The original regulation (the 1975 rules) required the septic system to be set back 100 feet from the stream. This provision agreed with the later-adopted 1980 Environmental Protection Agency Design Manual. That manual sets out a 100-foot distance from water supply sources such as wells, surface water, springs, and so on, but makes no reference at all to 100-year flood plain boundaries. In other words, the EPA did not recognize a need for a set-back from flood plain boundaries. To justify such a rule, the record should show some degree of scientific study on which to base the need or a health basis for the flood plain set-back. None appears here. All other 100-foot space rules are related to some source of potable water. Adoption of a rule relating to a theoretical boundary, without reference to any studies showing danger to waters, is arbitrary and capricious. No issue of public health is presented.

14

To escape the import of the lack of scientific basis for the 100-foot flood plain rule, the majority rely on the "presumption" that all legislative enactments are valid. As one judge has said, presumptions are the bats of the law; they disappear in the sunlight of evidence to the contrary, or the showing of no foundation for their existence.

Nor is "judicial deference" to the legislating body any excuse for upholding a baseless regulation. Courts should jealously insist on the right to examine judicially the actions of public bodies without any deferment or subordination of judicial function to other branches of government.

This dissenter was the author of the opinions in Knight v. City of Billings (1982), 197 Mont. 165, 642 P.2d 141, and Western Energy Co. v. Genie Land Co. (1987), 227 Mont. 74, 737 P.2d 478. The majority attempt to distinguish Knight, where the plaintiffs suffered a 30 percent loss in the value of their properties, on the basis that here the plaintiff still has a possibility of use for her property. Knight cannot be so distinguished, for even there the plaintiffs still had use of their properties as residences. Here, the plaintiff is severely limited in the use of her property under the 100-foot flood plain rule. Her only possibility is to build 1200 to 1400 feet back from the river, or to undertake very expensive devices for sewage disposal. Western Energy is not in accord with this decision. Western Energy was not a "taking" case.

15

It related to the due process implication of the regulation involved.

I find no evidence in the record which translates to a basis that the 100-foot flood plain set-back rule is substantially related to the public health. Under the record here, that rule could have been set at 30 feet or a mile. Either is as justifiable here as the 100-foot rule. No studies support the regulation. I therefore dissent and would reverse and remand for judgment in favor of the plaintiff.

_____
John C. Sheehy
                Justice

16